CASE 3—PETITION ORDINARY—JUNE 6.

# Porter, &c., vs. Botts.

APPEAL FROM BATH CIRCUIT COURT.

1. Where a horse that had been stolen from the owner had been used by the wrongful taker in aid of the rebellion, and was captured by the U. S. forces from the public enemy, and was afterwards regularly inspected and sold by a Quarter-Master as condemned property, the title of the original owner was not thereby divested.

2. The acts of Congress authorizing the forfeiture of private property apply only to cases where the property was used in aid of the rebellion with the owner's consent; or, where the owner himself engaged in the rebellion, or aided or abetted it. And these facts must be *judicially* ascertained—the military having no legal right to determine when, or for what cause, the citizen's property shall be forfeited.

3. Where the government had no title to property sold by a quarter-master, the purchaser at such sale could acquire none, and he must resort to his vendor for reimbursement.

B. D. LACY, for appellant, cited *Hardin*, 31; 1 *Dana*, 110.

NESBITT & GUDGELL for appellees.

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

The parties agreed to submit this case to the decision of the circuit judge, without the intervention of a jury. It is agreed in the bill of exceptions that the appellant, Nancy Porter, owned the mare in controversy when it was stolen from her.

That previous to February 3d, 1864, said mare had been captured by the United States military forces, and being in the possession of the quarter-master of said forces at Cat-lettsburg, in this State, was, on February 3d, 1864, properly inspected and condemned, and sold as condemned property by A. J. Allen, Capt. and A. Q. U. S. A.

Though the matter in controversy is of small value, yet it involves a question of vast magnitude, both as to the government and to the citizens; and, therefore, we have devoted considerable attention to it.

The counsel have referred to but little authority, and seem not to have examined the laws authorizing military officers to make sales of condemned property belonging to the United States, and we may not have found all of the various acts of Congress relative thereto.

There is no intimation in the record that Mrs. Porter had ever been disloyal, or in any way aided the rebellion, or had permitted this or any other of her property to be used in aid thereof.

The mare was stolen from her, and it may be reasonably presumed that the United States military forces captured it from the public enemy.  But it is neither alleged nor proven that the public enemy captured it in the exercise of belligerent rights, and thereby become invested with the title, which might possibly pass to the United States by virtue of the capture from them.

It is then a simple question whether, if property be stolen, and the wrongful taker should illegally use it, and the government should capture it whilst being so used in aid of the rebellion, the title, by reason thereof, passed to it, and the owner's rights thereto become forfeited.

Belligerent rights not being necessarily involved, we shall not consider them.

We understand the condemnation to have been by a military officer, and not by judicial proceedings, and shall so consider it.

By an act of Congress, approved March 3d, 1825 (*U. S. Stat. at Large, vol.* 4, *p.* 127, *or "Military Laws of U. S.," by*

*Callan, p.* 314): "The President of the United States is authorized to cause to be sold any ordnance, arms, ammunition, or other military stores or subsistence, or medical supplies, which, upon proper inspection or survey, shall appear to be damaged, or otherwise unsuitable for public service. * * * That the inspection or survey of the unserviceable stores shall be made by an Inspector General, or such other officer or officers as the Secretary of War may appoint for for that purpose; and the sales shall be made under such rules and regulations as may be prescribed by the Secretary of War."

It may be fairly presumed that Captain Allen was fully authorized, under the rules and regulations prescribed by the Secretary of War, to have the unserviceable horses in his possession, belonging to the United States, condemned and sold, as provided for by this statute; and that his inspection, condemnation, and sale, were proper, so far as the property actually belonged to the United States; but this, nor any other act of Congress which has met our eyes, authorized any military officer to determine the rights of property, nor when, nor for what, the citizen's property should be confiscated.

The act of Congress to confiscate property used for insurrectionary purposes, approved August 6th, 1861 (12 *U. S. Stat. at Large,* 319), declares all property employed in aid of the rebellion, *with the consent of the owner,* to be lawful subject of *prize,* and *captured* wherever found.

The act of Congress, approved July 17th, 1862 (12 *U. S. Stat. at Large,* 591), to suppress insurrection, punish treason, &c., declares in section 6, that if any person within any State or territory of the United States, after the passage of this act, *being engaged in armed rebellion* against the government of the United States, *or aiding or abetting such rebellion* (save certain persons before named), shall not, within sixty days after public warning and proclamation duly given, *cease to aid, countenance, and abet such rebellion,* and return to his allegiance to the United States, *" all the estate and property, moneys, stocks, and credits of such persons shall be liable to seizure aforesaid."*

But both of these statutes require a judicial condemnation of such property.

The first authorizes the forfeiture of the right of property, because of its use to aid the rebellion *with the owner's consent;* the other *because the owner himself engaged in the rebellion or aided or abetted it;* and these are the only acts of Congress known to us applicable to this case.

These statutes clearly manifest the legislative intent, that before the citizen can be deprived of his property, there must be a judicial finding that he has either permitted such property to be used in aid of the rebellion, else that he himself has engaged in it, or aided or abetted it, and for these his property may be condemned to sale for the benefit of the government.

Congress has very properly withheld from military officers any right to determine when, and for what cause, the citizen's property shall be forfeited, as both unconstitutional and impolitic.

But for this statute of March 3, 1825, or some similar enactment, no military officer could sell and convey the title of the United States to its public property. The legal effect, therefore, of *the proper inspection, condemnation, and sale* of government property, by a duly authorized military officer, *is to pass to the purchaser its title,* and nothing more.

Should the military officer transcend his powers and duties, as prescribed by said act of Congress, and assume to confiscate, condemn, and sell the citizen's property, his acts would be a mere nullity, and can in no way transfer the right of property to the purchaser. He can by no such illegal act divest the owner of his right of property. It was the duty of the government to protect its loyal citizens and loyal States against its public enemies. If in its weakness, and being surrounded by numerous embarrassing difficulties, growing out of such a gigantic rebellion, it was unable to do this, and the citizen's property, by reason thereof, was taken by the marauding bands, thieves and robbers, of which those revolutionary times were so prolific, it can but be right that the

government should restore to the citizen the property taken by them, when in its power to do so.

And to the credit of the national legislature let it be said, it has not been so unmindful of the great duty of protection due from the government to the citizen, nor has it been so unjust as to claim the citizen's property, by any enactment, when that property has been wrongfully taken by its enemies, and for want of its due protection, though the property may have been illegally used against it to aid the rebellion.

The thief got no right of property by his felonious act; neither a purchaser from him, nor his captor, could get any by virtue of such felonious act. The appellant could only lose her right of property by permitting it to be used to aid the rebellion, or by aiding it herself. Therefore, the government had no title to sell, and the sale of the quarter-master passed no title to the purchaser; but he, like all other purchasers, private and public, got only the title possessed by his vendor, and such as it could pass, and like these, too, he must resort to his vendor for reimbursement when no title passes.

It is apparent, from this view of the case, that the court erred in adjudging the mare to defendant Botts; and the judgment is, therefore, reversed, with directions for further proceedings in conformity to this opinion.